IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| IN RE THE COMPLAINT AND PETITION | § | |
| OF SIGNET MARITIME CORPORATION, | § | |
| AS OWNER OF THE TUG SIGNET | § | CIVIL ACTION NO. 05-413 |
| LIBERTY, ITS ENGINES, TACKLE, ETC. | § | |
| IN A CAUSE OF EXONERATION FROM | § | |
| OR LIMITATION OF LIABILITY | § | |
| | § | |

**BOSS EXPLORATION AND PRODUCTION CORPORATION'S
MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

Claimant Boss Exploration and Production Corporation ("Boss") files this motion requesting the Court to enter summary judgment in favor of Boss on the claims asserted against it in this action by Claimants James Sawberger and Rachel Sawberger.

**BACKGROUND**

1.     At the time of the alleged incident, Claimant James Sawberger ("Sawberger") was a deckhand on the M/V Signet Liberty. *See* Claimants James Sawberger and Rachel Sawberger's Second Amended Claim for Damages and Original Answer to Signet Maritime Corporation's Petition and Complaint for Exoneration from or Limitation of Liability, Civil and Maritime ("Sawberger's Second Amended Claim") at p. 2.

2.     As part of his responsibilities, Sawberger boarded a barge that was tied up to an oil/gas well located in Corpus Christi Bay. *Id*; *see also* excerpts of Deposition of Sawberger taken February 28, 2006 attached as Exhibit "A." The well in question is owned and operated by Boss. *Id*; *see also* Exhibit "A" and Boss's First Amended Answer to Claimants James and Rachel Sawbergers' First Amended Claim for Damages ¶7 at 2 (Boss's admission that it is the owner and operator of well no. 2).    Sawberger claims that while he was on that barge, he slipped in an unknown substance, which he speculates to be mud or well bore fluids, and allegedly injured his

back. *See* Sawberger's Second Amended Claim at p. 2; *see also* Exhibit "A" at p. 126:3 - 17; 262:3 – 263:2.

## ARGUMENT AND AUTHORITIES

3.      Pursuant to Rule 56, a party may obtain a summary judgment if it can be shown that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See* FED. R. CIV. P. 56(c). Rule 56 has been interpreted as "mandat[ing] the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential that party's case, and on which that party will bear the burden of proof." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Accordingly, to survive a motion for summary judgment, the nonmovant must go beyond the pleadings and establish that there is a genuine issue of material fact through the use of available evidence. *See id.* at 327; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86.

### A.      Sawberger's Claims.

4.      The claims brought against Boss in this action fall within the Court's federal admiralty jurisdiction. Pursuant to 28 U.S.C. § 1331(1), a tort claims falls within the scope of admiralty jurisdiction if the claim satisfies both the location test and the connection test. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995). The location test is satisfied when the alleged tort occurred on navigable water, or when the alleged injury was caused by a vessel in navigable water. *Id.* at 534-35. The connection test is satisfied by demonstrating two things: 1) that the activity at issue has a potential to disrupt maritime commerce, and 2) that the general character of the underlying activity bears a substantial relationship specifically to maritime activity. *Id.*

5.      Generally, "[i]njuries caused by slip and fall accidents on board a vessel have consistently been found to constitute maritime torts." *Palmer v. Fayard Moving and Transportation Corp*, 930 F.3d 437, 441 (5th Cir. 1991). Sawberger's pleadings and deposition testimony conclusively show that both the location and connection tests are satisfied in the current matter.[1] Accordingly, maritime law applies.

6.      Sawberger's claims for damages against Boss are predicated on theories of premises liability, negligence and gross negligence. *See* Sawberger's Second Amended Claim at p. 7-8. Such claims fail as a matter of law for the reasons discussed below.

### 1.      Premises liability.

7.      The Supreme Court of the United States established in 1959 that premises liability does not apply to claims governed by maritime law. *Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 631-32 (1959); *see also Rutledge v A & P Boat Rentals, Inc*, 633 F.Supp. 654, 656 (W.D.La. 1986). Accordingly, Sawberger's claims for premises liability are not recognized legal theories of recovery under general maritime law.

8.      As such, Boss is entitled to judgment as a matter of law on Sawberger's premises liability claims.

### 2.      Negligence.

9.      Under maritime law, Sawberger's recovery under negligence theory of recovery requires proof of the following elements:

    1.      A duty or obligation requiring a person to conform to a certain standard of conduct;

---

[1] *See* Claimants James and Rachel Sawberger's Second Amended Claim for Damages and Original Answer to Petitioners' Complaint for Exoneration from or Limitation of Liability, Civil and Maritime at p. 2-3 (noting the barge in question was located in the Corpus Christi Bay at the time of the incident); *see also* Exhibit "A," at p. 100-123 (describing in detail the activities Sawberger was involved in, specifically his role in tying a boat to the barge in order to transport the barge to another location at the time of the alleged incident).

2.    A breach of that duty, or a failure to conform to the prevailing standard of conduct,

3.    Proximate cause – a reasonably close connection between the conduct and the resulting injury,

4.    Actual loss or damage.

*Vulcan Materials Co. v. Vulica Shipping Co., Ltd*, 859 F.Supp. 242, 249 (5th Cir. 1994) (citing W. Page Keeton, Prosser and Keeton on Torts, 263, 269 (5th Ed. 1984)). "The determination of whether a party owes a duty to another depends on a variety of factors, 'most notably the foreseeability of the harm suffered by the complaining party.'" *Steel Coils, Inc. v. M.V. Lake Marion,* 2002 A.M.C. 1680 (E.D. La 2002) (quoting *Consolidated Aluminum Corp. v. C.F. Been Corp*, 833 F.2d 65, 67 (5th Cir. 1988)).

10.    In *Pledger v. Phil Guilbeau Offshore, Inc*, the federal district court relied upon this principle in determining that Stone Energy Corporation, the company that had chartered the boat in question, had no duty and was not liable for injuries suffered as a result of the complainant's slip and fall on the deck of that boat. *Pledger v. Phil Guilbeau Offshore, Inc*, 2003 WL 2012382 at *1, *6-*7 (E.D.La.) (relying, in part, on *Consolidated Aluminum Corp*, 833 F.2d 65 (5th Cir. 1988)). In *Pledger*, the claimant alleged that Stone Energy Corporation was negligent in ordering to him to perform certain activities under hazardous conditions, specifically working on a deck made slippery by algae on the deck while in rough seas. *Id.* at 6. The *Pledger* court noted there was no evidence that Stone Energy was informed or otherwise knew that the deck on the ship was slippery. *Id.* at 6. In addition, no one notified Stone Energy that a condition, particularly rough seas, existed at the time of the activity in question. *Id.* The court found that due to the lack of such knowledge, Stone Energy could not foresee any danger that would result in harm to the claimant. *Id.* Accordingly, Stone Energy, the company that chartered the boat in question, owed no duty to the claimant as a matter of law. *Id.* at 7.

4

11.     In this case, there is no evidence that Boss knew of any alleged mud or wellbore fluids on the deck of the barge in question. There is no evidence that Boss knew activities would be undertaken at night in conditions of supposedly questionable additional lighting. There is no evidence that any harm suffered by Sawberger as a result of allegedly slipping in a substance he could not see due to lack of lighting was known to or otherwise foreseeable by Boss. The upshot is that Boss owed no duty to Sawberger in this regard and Sawberger's negligence claim fails as a matter of law.

12.     In addition, cases evaluating negligence under the Jones Act are instructive as to whether particular circumstances give rise to a duty on the part of Boss under the facts of this case.[2] In *Shannon v. Union Barge Line Corp*, on appeal from a directed verdict in favor of the ship owner, the court found that in the absence of proof as to how oil got on the deck of the ship and how long it had been there, the claimant was not entitled recover injuries for slipping and falling in that oil. *Shannon v. Union Barge Line Corp* 194 F.2d 584, 585-86 (3rd Cir. 1952); *see also Cookingham v. United States*, 184 F.2d 213, 215-16 (3rd Cir. 1950). In *Adamowski v. Gulf Oil Corp.*, the court found that because the claimant did not offer any evidence with respect to how long an oily condition had existed on the deck, the plaintiff had not sustained his burden of demonstrating that the ship owner could have discovered and corrected the unsafe condition. *Adamowski v. Gulf Oil Corp.*, 93 F.Supp. 115, 116 (E.D. Penn. 1950), *aff'd* 197 F.2d 523 (3rd Cir. 1952).

13.     Here, Sawberger's pleadings and deposition testimony clearly indicate that not only is there no evidence of how the substance got on the deck of the barge or how long it had been

---

[2] It should be noted that with respect to cases alleging negligence under the Jones Act, which only applies in situations involving direct employer-employee claims, the claimant operates under a reduced burden of proof as to causation. *See, e.g., Ribitzki v. Canmar Reading & Bates, Ltd Partnership*, 111 F.3d 658, 662 (9th Cir. 1996). Particularly, a claimant need only prove that the employer played even a slight part in producing the injury. This burden has been labeled as "featherweight." *Jones v. Offshore Exp., Inc*, 845 F.2d 1347, 1353 (5th Cir. 1988)

there, Sawberger has no clear evidence about the identity of the substance. *See* Exhibit "A" at p. 126:3 - 17; 262:3 – 263:2.

14.    In his deposition testimony, Sawberger admitted that he had no personal knowledge of how the alleged substance got on the deck of the barge or how long it had been there. Absent other competent summary judgment evidence, Sawberger does not have any evidence that Boss owed him any duties, much less any evidence of any causal connection between his alleged injuries and acts or omissions on the part of Boss.

### 3.    Gross negligence.

15.    Sawberger also asserts a claim against Boss for recovery of punitive/exemplary damages based on allegations of gross negligence. *See* Sawberger's Second Amended Claim for Damages at p. 9.

16.    Sawberger's claim for punitive or exemplary damages is not recoverable under maritime law. *Scarborough v. Clemco Indus.*, 391 F.3d 660, 668 (5th Cir. 2004) (uniformity principles under maritime law precluded Jones Act seaman from recovering nonpecuniary damages from non-employer third parties); *Ellison v. Messerschmitt-Bolkow-Blohm*, 807 F.Supp. 39, 41 (E.D. Tex. 1992) (citing *Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990)). As a matter of law, Sawberger cannot recover punitive or exemplary damages from Boss.

### B.    Claimant Rachel Sawberger's Claims.

17.    Claimant Rachel Sawberger ("R. Sawberger") seeks recovery for damages for loss of consortium as a result of the alleged injuries suffered by Sawberger. *See* Sawberger's Second Amended Claim for Damages at p. 12.

18.    The law in this area is clear – damages for loss of consortium are not recoverable under general maritime law. *Reynolds v. Zapata Off-Shore Co.*, 796 F.Supp. 1015, 1016 (S.D. Tex.

1992) (relying on *Michel v. Total Transp., Inc.*, 957 F.2d 186, 191 (5th Cir. 1981)); *see also*
*Scarborough v. Clemco Indus.*, 391 F.3d 660 at 668.   Accordingly, the assertion of loss of
consortium claims in an action governed by general maritime law warrants summary judgment
as a matter of law. *Reynolds*, 796 F.Supp. at 1016-17.

## I.
## CONCLUSION

Boss is entitled to summary judgment on all claims asserted against Boss by Claimants
James and Rachel Sawberger for the following reasons:

a)   under maritime law, Sawberger cannot recover damages under a
premises liability theory;

b)   Boss owed no duty with respect to the alleged substance and was
not negligent as a matter of law;

c)   Maritime law bars any recovery of punitive or exemplary damages
by Sawberger; and

d)   Maritime law bars any recovery of loss of consortium damages by
Claimant R. Sawberger.

Claimant Boss Exploration and Production Corporation respectfully requests that this
Court grant its Motion for Summary Judgment and enter and enter judgment that Claimants
James and Rachel Sawberger take nothing by their claims against Boss Exploration and
Production Corporation.

Respectfully submitted,

Robert B. Boemer
State Bar No. 02550550
Fed. I.D. No. 10824
One Allen Center
500 Dallas Street, Suite 2600
Houston, Texas   77002
Telephone: (713) 655-7511
Facsimile:  (713) 655-7526

**ATTORNEY-IN-CHARGE FOR BOSS
EXPLORATION AND PRODUCTION
CORPORATION**

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2006, a true and correct copy of the foregoing document

was served via facsimile, as follows:

Sheadyn R. Rogers
Sheehan & Rogers, L.L.P.
5449 Bear Lane, Suite 436
Corpus Christi, Texas 78405

Mr. Michael M. Murphy
Hays, McConn, Rice & Pickering, P.C.
400 Two Allen Center
1200 Smith Street
Houston, Texas 77002

Will W. Pierson
Christopher Lowrance
Royston, Rayzor, Vickery & Williams, L.L.P.
802 North Carancahua, Suite 1300
Corpus Christi, Texas 78470

Robert B. Boemer

# EXHIBIT "A"

James Sawberger                                                                                    Cause No. 05-413
2/28/2006                                                                                    In Re Signet Maritime Corp.

**Page 98**

1 typically. You would come -- you'd go out in the
2 morning and come back in the evening?
3    A.  Yes, sir.
4    Q.  Now, on -- well, what is the date when you
5 claim to have had an accident? Is that February the
6 5th?
7    A.  Yes, sir.
8    Q.  All right. Do you recall what you did on
9 February the 4th, the day before you claim you had
10 your accident?
11   A.  I -- I don't remember.
12   Q.  Okay. Do you remember when you came in on
13 February the 4th?
14   A.  No, sir.
15   Q.  Can you -- can you walk us through, then,
16 when did you first go out to the rig on the date
17 that your accident happened? Was it in the morning?
18   A.  Yes, sir.
19   Q.  All right. So when would you normally show
20 up at the yard, 5:30, 6:00 o'clock in the morning?
21   A.  I don't think it was that early because,
22 like I said, it was a day rig. That didn't --
23 they -- I don't think they got started till about
24 7:00.
25   Q.  Okay.

**Page 99**

1    A.  I mean, if we were taking something out and
2 knew it, yeah, we'd get it down a little bit earlier
3 to have it out there and waiting on them.
4    Q.  When would you typically show up at Signet
5 ready for work?
6    A.  Depends on what we were doing, 5:00.
7    Q.  5:00 or 6:00 in the morning, usually?
8    A.  Yeah.
9    Q.  And is that when you think you showed up
10 for work that day, 5:00 or 6:00 in the morning?
11   A.  Yes.
12   Q.  What did you do when you got to work?
13   A.  I would check the engines, check the oil
14 levels, water, main engines, generator, the gear,
15 lube oil in the gears, and crank them up, let them
16 run, warm up.
17   Q.  So you did all that that morning?
18   A.  Yes, take shore power off and be ready to
19 leave.
20   Q.  What time did you leave the dock that
21 morning?
22   A.  I don't recall.
23   Q.  Was it -- would you normally leave around
24 6:30 or 7:00 in the morning?
25   A.  Yes.

**Page 100**

1    Q.  Okay. And is that -- do you think it was
2 just a normal morning on the date of the accident?
3    A.  Yes, sir.
4    Q.  Leaving around 6:30 or 7:00 in the morning?
5    A.  Oh, yes, normal time.
6    Q.  All right. And did you have any -- were
7 there any incidents or any problems getting out to
8 the rig that morning?
9    A.  No, sir.
10   Q.  Who did you do when you got out to the rig?
11   A.  Tied the barge up.
12   Q.  Did you take a barge out there with you, or
13 did you go out without a barge to the rig?
14   A.  We took a barge.
15   Q.  Was there anything on that barge?
16   A.  There was a FESCO truck and a manifold, a
17 trailer, and a tank.
18   Q.  Were they -- were those pieces of
19 equipment -- well, how do you know it was a FESCO
20 truck?
21   A.  It had FESCO wrote on the side of it.
22   Q.  Did the other pieces of equipment say
23 anything on the side?
24   A.  FESCO.
25   Q.  They all said FESCO?

**Page 101**

1    A.  Yes.
2    Q.  Do you know what the -- the barge was that
3 you took out there?
4    A.  No, sir.
5    Q.  Do you know who owned the barge?
6    A.  Dugat owned it.
7    Q.  When you say Dugat, you mean Raymond Dugat
8 Company?
9    A.  Yes.
10   Q.  How do you know that it was a Dugat barge?
11   A.  That's what I was told.
12   Q.  Do you remember who told you that?
13   A.  Gerry.
14   Q.  Gerry Meador?
15   A.  Yes.
16   Q.  Do you know the call numbers or letters for
17 that particular barge that you took out that
18 morning?
19   A.  No, sir.
20   Q.  Was that the same barge that you were
21 making up to when you claim you had your accident?
22   A.  Yes.
23   Q.  Do you know whether or not that barge was
24 leased or chartered to somebody?
25   A.  No, sir.

Clanton & Associates, Inc. - Court Reporting & Records Retrieval
555 N. Carancahua, Ste. 130                  Corpus Christi, TX 78478                  Phone: (361) 884-1988

James Sawberger
2/28/2006

Cause No. 05-413
In Re Signet Maritime Corp.

Page 102

1    Q.  You don't know one way or the other?
2    A.  No, sir.
3    Q.  What happened -- well, was there anybody on
4  the barge, or was it just that -- did it just have
5  equipment on it when you took it out?
6    A.  I don't really remember.  They had -- I
7  think that three men were on it.
8    Q.  Were on the barge?
9    A.  Yes.  They had the FESCO pickup there.
10   Q.  There was a pickup that said FESCO on the
11 side that was parked at Signet's yard?
12   A.  No, sir.  It was on the barge.
13   Q.  Oh, I see.  The pickup was on the barge
14 itself?
15   A.  Yes.
16   Q.  And you think there were three men in the
17 pickup riding out to the rig?
18   A.  Yes, sir.  It was a short ride to the rig.
19   Q.  Were those -- did you ever talk to any of
20 those folks from FESCO?
21   A.  No, sir.
22   Q.  Did -- how did you know they were from
23 FESCO?  Did they have on uniforms that said FESCO?
24   A.  Yes, sir, uniforms.
25   Q.  And what happened when you got the barge

Page 103

1  out to the rig?
2    A.  Tied it up beside the rig.
3    Q.  Did you leave the tug attached to the
4  barge, or did you unmake from the barge?
5    A.  We broke away from it.
6    Q.  And how long did that process take?  Did
7  that take the whole morning?
8    A.  No, just a little while.
9    Q.  After you -- well, did you have any
10 problems tying up the barge to the rig or unmaking
11 the barge -- or the tug from the barge?
12   A.  No, sir.
13   Q.  After you finished doing that, what did
14 you -- what happened next?
15   A.  I don't remember.  I don't remember.
16   Q.  Was there any -- was there any -- well,
17 this is happening during daylight, right?  It's in
18 the morning?
19   A.  Yes.  This is -- it's daylight by now.
20   Q.  All right.  Is there any mud or fluid or
21 anything on this barge --
22   A.  No.
23   Q.  -- when you're making -- tying it up to the
24 rig or unmaking it -- the tug from that barge?
25   A.  No, sir.  I seen some sandblasting sand on

Page 104

1  it.
2    Q.  That's all you saw?
3    A.  Uh-huh.
4    Q.  Was that a yes?
5    A.  Yes.
6    Q.  What's the next thing that you recall doing
7  for work that day?
8    A.  I don't remember.
9    Q.  You were on standby at the rig?
10   A.  I'm not sure if we had to go back in and
11 take some -- get another barge with Schlumberger.  I
12 don't remember.
13   Q.  Okay.  What's the -- what's the next thing
14 that you do remember happening that day?
15   A.  It was late in the afternoon when we were
16 leaving.  We were told to take FESCO in.  It was --
17 it was well after dark by then, and, you know,
18 that -- the rig was running their generator for the
19 light because, like I said, it was a day rig.  And
20 that's when the accident happened, and we were -- I
21 was making the boat up to that barge with those
22 trucks -- with that truck and their equipment on it.
23   Q.  After you would unmake the tug from the
24 barge, where would you go for -- to be on standby
25 for the rig?

Page 105

1    A.  Right beside the rig.
2    Q.  Just to -- bit away from the barge a little
3  bit?
4    A.  Yes.
5    Q.  Now, what time -- you said it was after
6  dark when you received word that you needed to bring
7  the FESCO barge or the barge with the FESCO
8  equipment on it back in?
9    A.  Yes, sir.
10   Q.  And this is the same barge you'd brought
11 out earlier in the day?
12   A.  Yes, sir.
13   Q.  Where did you get that word from?  Did that
14 come over the radio, or how did that happen?
15   A.  I heard it from Gerry.
16   Q.  Do you know where he received his
17 instructions from?
18   A.  He has a radio, or they walked up to the --
19 he was -- he might have been upstairs and heard it.
20 I don't know.
21   Q.  All right.  Now, you said there were --
22 there were lights on the rig?
23   A.  Yes.
24   Q.  So the -- would the rig lights have been
25 shining down, at least in part, on the barge that

27 (Pages 102 to 105)

James Sawberger                                                          Cause No. 05-413
2/28/2006                                                          In Re Signet Maritime Corp.

Page 106

1  was still tied up next to the rig?
2      A.  One side of it, yes.
3      Q.  The side that was closest to the rig would
4  have light on it?
5      A.  Yes, sir.
6      Q.  All right.  Did the barge itself have any
7  lights on it?
8      A.  Just the normal running lights.
9      Q.  Navigational lights?
10     A.  Navigation lights, yes.
11     Q.  Now, the tug had -- the tug Liberty has a
12 floodlight on it?
13     A.  Yes, sir.
14     Q.  That's mounted on the wheelhouse?
15     A.  Yes, sir.
16     Q.  In the center of the wheelhouse?
17     A.  Yes, sir.
18     Q.  And does it have any other search lights or
19 spot lights?
20     A.  It's got two search spot lights, and
21 flanking lights.
22     Q.  Where are the search lights?
23     A.  On top of the wheelhouse.
24     Q.  Are they handheld, or are they mounted to
25 the top of the wheelhouse?

Page 107

1      A.  They're mounted.
2      Q.  Are they -- can they be moved?  Can they be
3  maneuvered from inside the wheelhouse and pointed in
4  different directions?
5      A.  Oh, yeah.
6      Q.  And are they run off of, I guess, engine
7  power from the engines?  I mean they're wired into
8  the wheelhouse?
9      A.  Yes, it's -- they're electrical, yeah.
10     Q.  I mean, it's not like I would go to an auto
11 parts store and buy a little spotlight to place in
12 my cigarette lighter?  It's not like that, is it?
13     A.  Oh, no, sir
14     Q.  It's a built-in search light?
15     A.  Yes, sir
16     Q.  Actually, two of them -- are they -- you
17 said there is one mounted on each corner of the
18 wheelhouse at the top?
19     A.  Well, they're beside each other, yeah.
20 There's enough room between them to -- you know, to
21 turn them.  They'll turn 360 degrees.
22     Q.  Independently of each other?
23     A.  Yes, sir.
24     Q.  You can have one pointing forward and one
25 pointing back?

Page 108

1      A.  Yes.
2      Q.  You mentioned another kind of light that
3  was on the tug, flank lights?
4      A.  Yes, sir.
5      Q.  What are flank lights?
6      A.  Side lights.  But they just were mounted on
7  top of the wheelhouse to shine off to the sides of
8  the boat.
9      Q.  Are they navigational lights, or are
10 they --
11     A.  No.
12     Q.  -- spotlights?
13     A.  No, sir.  They're not navigational light.
14     Q.  So they're bright, white, flood-type
15 lights?
16     A.  Just like a flood-type light, yes.
17     Q.  Are they fixed into position, or can they
18 be maneuvered?
19     A.  Well, they're fixed in position, but to
20 move them you have to go up there to change the
21 position.
22     Q.  Okay.
23     A.  They're adjustable, is what I'm saying.
24     Q.  But you'd have to go up, and would you have
25 to actually unscrew them and move them and screw

Page 109

1  them back in?
2      A.  Yes.
3      Q.  Is that also true with the center spotlight
4  in the center of the wheelhouse?
5      A.  Yes, sir.
6      Q.  Are there any other lights that provide
7  visibility for when you're working, other than the
8  center flood light, the two flanking flood lights,
9  and the two spot lights?
10     A.  No, sir, that's about it.  The rest are
11 navigation lights.
12     Q.  Yeah, like your red and green and your
13 white stern light?
14     A.  Yeah, the amber tow light.
15     Q.  And I think you already told me that there
16 were no lights on the barge; is the true?
17     A.  Just the navigation lights.
18     Q.  Sure.  But, I mean, when I say lights on
19 the barge, I'm really thinking, Did they have any
20 lights on the deck of the barge?
21     A.  No, sir.
22     Q.  Any temporary lights or light stands?
23     A.  No, sir.
24     Q.  Where are the lights located on the rig?
25     A.  It was two decks, and most of the lights

Clanton & Associates, Inc.  - Court Reporting & Records Retrieval
555 N. Carancahua, Ste. 130          Corpus Christi, TX  78478          Phone: (361) 884-1988

James Sawberger
2/28/2006

Cause No. 05-413
In Re Signet Maritime Corp.

Page 110

1  were up by where the well was at. Now, these are
2  just light bulbs screwed into a socket. They're not
3  really shining out.
4      Q.  Okay. They had a series of light bulbs and
5  sockets up at the second level of the rig?
6      A.  Yes. It's below the -- it's at the roof of
7  the second level.
8      Q.  Near where the well head is?
9      A.  Yes, sir.
10     Q.  Were there any other lights from the rig?
11     A.  No, sir.
12     Q.  Are there any flood lights or spot lights
13 on the rig?
14     A.  None that I know of, no.
15     Q.  The -- the light that would be on the
16 barge, where would that be coming from? Would that
17 be coming from the rig or from your tug or both?
18     A.  Most from the rig.
19     Q.  Now, you said it was after dark when you
20 received a word to take the FESCO barge back to the
21 dock?
22     A.  Yes, sir.
23     Q.  How long after dark? Approximately what
24 time of the evening are we talking about?
25     A.  8:30, 9:00, somewhere in there.

Page 111

1      Q.  In the evening?
2      A.  Yes, sir.
3      Q.  How long had it been since you had been on
4  that barge?
5      A.  Well, that morning.
6      Q.  So about six or seven, maybe eight hours?
7      A.  Or more. They worked late that night. I
8  guess FESCO had to finish up what they were doing.
9  I don't know nothing about that.
10     Q.  Did you see the FESCO -- FESCO folks
11 actually working on the barge after you tied it to
12 the rig that morning?
13     A.  Oh, yes, sir.
14     Q.  What did you see them doing?
15     A.  They were dragging out pipe and putting it
16 together.
17     Q.  Anything else that you can recall?
18     A.  No, sir. That's basically all.
19     Q.  Was the pipe -- had the pipe been carried
20 out there on the barge?
21     A.  Yes, sir. They had the truck, and it had
22 some -- I guess some other tools and pipe in it.
23 They had a trailer. They called it a manifold and a
24 tank on the barge.
25     Q.  So they had taken -- they were taking the

Page 112

1  pieces of pipe that were carried out there and
2  putting them together?
3      A.  Yes, sir.
4      Q.  Were they then taking them up onto the rig,
5  or did those pipes stay on the barge?
6      A.  They ran across the barge from the manifold
7  to the well.
8      Q.  Did you -- did you have any understanding
9  as to whether or not anything was being moved using
10 that pipe? Was anything being pumped from the
11 manifold to the rig or vice versa?
12     A.  That's all Greek to me. I don't know
13 nothing about that.
14     Q.  Was the manifold on the tank, or just was
15 the -- was the manifold just on the barge itself?
16     A.  The manifold was on the barge. So was the
17 tank.
18     Q.  Did you see -- how far away from you was
19 the tug from the barge when the FESCO folks were
20 doing their work?
21     A.  Be hard for me to estimate that.
22     Q.  Close enough where you could see what they
23 were doing?
24     A.  50 feet, if that.
25     Q.  So pretty close?

Page 113

1      A.  Oh, yes. That's at the most.
2      Q.  Okay. So you didn't have to go very far
3  with the tug to start making back up to the barge
4  again? It was just about a 50-foot trip?
5      A.  Or less, yes.
6      Q.  Okay. Were the flank lights on?
7      A.  No, sir.
8      Q.  Why weren't the flank lights on?
9      A.  I don't know.
10     Q.  Was the center search light on?
11     A.  Yes, sir.
12     Q.  Were the two spot lights on the wheelhouse
13 on?
14     A.  No, sir.
15     Q.  Okay. Why -- was there any reason why the
16 search lights were off?
17     A.  Not that I -- none that I'm aware of.
18     Q.  All right. Now, was it the normal
19 procedure for making up to a barge like the one you
20 were making up to for the captain to turn the tug
21 from one side to the other to make it easier for you
22 to reach the cable onto the timberheads on each side
23 of the barge?
24     A.  Yes, sir.
25     Q.  So how did -- how did you start to make up

Clanton & Associates, Inc. - Court Reporting & Records Retrieval
555 N. Carancahua, Ste. 130                Corpus Christi, TX 78478                Phone: (361) 884-1988

Page 114

1  to the barge that evening? Did you start on the
2  port or the starboard side?
3     A.  Port side first.
4     Q.  So Captain Meador would bring the -- the
5  tug around to the port so that the port side of the
6  tug was up against the port, stern portion of the
7  barge?
8     A.  Correct.
9     Q.  Now, what, then, is the first thing that
10 you would do as the deck hand, once the tug was in
11 position on the port?
12    A.  I would grab the starboard wire and -- and
13 he would start unspooling the cable to put that wire
14 onto the starboard timberhead.
15    Q.  Well, if you're made up -- if you have the
16 port side of the tug up to the port, stern of the
17 barge, are you going to get the starboard wire first
18 or the port wire first?
19    A.  Oh, the port wire first.
20    Q.  Okay. That's what I'm asking you. You
21 just said starboard.
22    A.  Oh, I misunderstood you. We had -- I'd
23 already put the port wire on.
24    Q.  Okay.
25    A.  He was moving the boat and releasing the

Page 115

1  port winch to come around --
2     Q.  Well, let's start over again.
3     A.  All right.
4     Q.  When you first come up to make up to the
5  barge, do you make up the port side first or the
6  starboard side first?
7     A.  Well, it just depends.
8     Q.  No, I mean, that night did you do the port
9  side first or the starboard side first?
10    A.  It was the port side first.
11    Q.  Okay. So there's no wires attached yet
12 between the tug and the barge, and you're going
13 to -- the first thing you're going to do is attach
14 the port wire to the barge?
15    A.  Correct.
16    Q.  All right. So in order to do that, the
17 captain turns the port side of the tug so that it's
18 flush up against the port, stern of the barge?
19    A.  No, sir, not flush. He would get it close.
20    Q.  But not --
21    A.  Not flush.
22    Q.  -- not parallel?
23    A.  No, no.
24    Q.  Okay. And then what's the first thing that
25 you would do after the captain put the tug into that

Page 116

1  position?
2     A.  Go grab the starboard cable.
3     Q.  Well --
4     A.  After. The boat's moving. He's moving it
5  around. He's releasing the port winch. He's coming
6  around. He -- he'll come around to the starboard
7  side, put the starboard wire on, and he would, like,
8  straighten it up with the starboard wire. They all
9  claim that the port winch was a little stronger than
10 that starboard winch.
11    Q.  So is the first wire that you hook from the
12 tug onto the barge the starboard wire?
13    A.  No, sir, it's a port wire.
14    Q.  Okay. But the first wire that you unspool
15 from the winch is the starboard wire?
16    A.  No, the port.
17    Q.  Okay. How did you get the port wire onto
18 the barge?
19    A.  He came close to the starboard -- the port
20 side, and he let the boat pull it off the spool.
21    Q.  Okay. How did he let the boat pull the
22 port wire off of the -- well, let me back up a step.
23 Is there already a length of wire that's been
24 unwound from the winch and is ready to be used to
25 hook onto the barge?

Page 117

1     A.  Sometimes. Some people do it, yes.
2     Q.  Well, I'm asking that night, was there
3  already a length of wire that was unspooled from the
4  port winch that was ready to be hooked onto the
5  barge?
6     A.  No, sir.
7     Q.  So the wire was also wound up into the
8  winch or onto the winch?
9     A.  Well, yes, biggest part of it. We were
10 told to -- while on standby and all that. And when
11 the wires are not in use, to throw them up on top of
12 the tires when we take them off of a barge and get
13 them out of the water. Don't let them just hang in
14 the water.
15    Q.  When you say on top of the tires, there's a
16 series of old tires that are mounted to the edge of
17 the deck to act as bumpers?
18    A.  Correct.
19    Q.  And so you have a length of wire that's the
20 standard length that you use to hook onto the barge,
21 right?
22    A.  No, not really, no.
23    Q.  Okay. Just depends on how the barge is
24 configured and how big it is?
25    A.  They're different sizes. They're different

30 (Pages 114 to 117)

Page 118

1  widths.
2      Q.  All right.  But you had already hooked up
3  to this barge earlier in the day?
4      A.  Yes.
5      Q.  All right.  And so you have the length of
6  wire already out of the winch that you've used on
7  this particular barge from earlier in the day?
8      A.  No, sir.  I threw them on the tires and he
9  spooled them up to get them out of the water.
10     Q.  Okay.  All right.  So he actually pulled
11  some of it back up onto the winch?
12     A.  Yeah.  Some of it, yes, not all of it.
13     Q.  All right.  So -- so he has to let some of
14  it out from the winch so that you can use it to hook
15  onto the barge?
16     A.  Correct.
17     Q.  So -- and he did that first on the port
18  side?
19     A.  Yes, sir.  That was the closest side.
20     Q.  All right.  And is there a piece of rope
21  that's attached to the end of the cable?
22     A.  Yes, sir.
23     Q.  And what's that piece of rope called?
24     A.  I don't know the correct --
25     Q.  Pendant?

Page 119

1      A.  Well, yeah, pendant, button.  It's a safety
2  feature.
3      Q.  And safety feature in the sense that it's a
4  lot easier for a person to grab onto a piece of rope
5  as opposed to a piece of wire, because the wire is
6  going to have -- it's going to be sharp and have
7  barbs on it?
8      A.  These were fairly new cables, wires.
9      Q.  But it's safer to use the rope than it is
10  the wire?
11     A.  Right.
12     Q.  So what would you do once the -- the cable
13  was let out of the port winch?
14     A.  If I had enough slack, you pulled the rope
15  over the timberhead and let the cable fall over.
16     Q.  Is that what you did that evening?
17     A.  On the port side, yes.
18     Q.  Okay.  And did you make up the port side in
19  the way that you showed us in Deposition Exhibit
20  No. 1, or did you do it differently?
21     A.  The same way that is.
22     Q.  Okay.  Was the -- was the cable already
23  placed on the front quarter bit on the port side, or
24  did you have to do that --
25     A.  It was already there.

Page 120

1      Q.  So you had to pick up the cable that was
2  already around the front quarter bit and loop it
3  over the timberheads on the barge?
4      A.  No, sir.  No, sir.  When you slack this
5  off, right up on the push knee, they had a hook.
6  You take this cable -- you had these series of
7  tires.  Throw the cable on top of the tires, put the
8  cable in that hook.
9      Q.  Okay.  And so the -- the end of the cable
10  there was available on the hook for you to take and
11  loop over the timberheads?
12     A.  It was the closest one, yes.  I had pulled
13  a little bit of wire out.
14     Q.  All right.  And so you looped the port side
15  cable over the timberheads over on the barge?
16     A.  Yes, sir.
17     Q.  And you stepped onto the barge in order to
18  do that?
19     A.  Yes, sir.
20     Q.  What did you do after you looped the port
21  cable over the port timberheads?
22     A.  I walked over to the bow and grabbed the
23  starboard cable.
24     Q.  Did you have to take the -- the port cable
25  from the barge timberheads all the way back to the

Page 121

1  rear quarter bit on the tug?
2      A.  No, sir.
3      Q.  Why not?
4      A.  That's clamped in.
5      Q.  Okay.
6      A.  It's fixed on the stern quarter bit.
7  It's --
8      Q.  All right.  So all you really have is
9  enough slack in the cable in order to be able to
10  loop the cable over the timberheads, right?  Because
11  the cable's already hooked into the -- both the
12  quarter bits on the port side of the tug?
13     A.  It's not -- this one is not hooked in.
14  It's running around it, and then over the edge of
15  the boat.
16     Q.  All right.  But the one in the -- the loop
17  is already --
18     A.  It's fixed.
19     Q.  -- fixed into the rear quarter bit?
20     A.  Correct.
21     Q.  All right.  Did you have any problems using
22  the -- the pendant, the piece of rope, to loop the
23  port side cable over the port side timberheads on
24  the barge?
25     A.  No, sir.

31 (Pages 118 to 121)

Page 122

Q. Now, which side of the barge is actually tied up to the rig at this point?
A. The port side.
Q. Okay. So you're now working on the side closest to the rig?
A. Correct.
Q. Was there any problem seeing what you were doing as you're hooking the port side cable onto the port side timberheads?
A. No, sir.
Q. Were you able to get that light from the center flood light on the tug? You were able to have enough light from that to be able to see what you were doing?
A. Well, that and the rig, yes.
Q. Okay.
A. The rig was right beside it.
Q. All right. Now, what did you do after you looped the port side cable over the port side timberheads?
A. Went to grab the starboard cable.
Q. Did you walk along the barge to do that?
A. I pulled out in front first because you get sideways of the boat -- like I said, you had the two bends around the cavel, then up over the rail. It's

Page 123

real hard to pull off the spool. I tried to pull it, and that's when I slipped.
Q. All right. And I think you're getting ahead of me a little bit. You would be standing on the --
A. Barge.
Q. -- at the back of the barge on the port side in order to loop the port cable over those timberheads, true?
A. Yeah, the port side.
Q. Okay. And then you would have to move over to the starboard side of the barge to do the starboard side cable work?
A. Correct.
Q. How did you get from the left side of the barge to the right side of the barge?
A. Walk.
Q. Walked along the barge, right?
A. Yeah.
Q. You didn't get back on the tug, did you?
A. No. No, no, no, no.
Q. That's all I was asking to start with.
A. Okay. Okay. I see what you mean.
Q. So you walked from the left side of the back of the barge to the right side of the back of

Page 124

the barge, correct?
A. Eventually, yes.
Q. All right. Before you put on the starboard wire?
A. Not before, no.
Q. You go to the -- you walk from the left side of the barge to the center of the barge so that you can pick up the starboard wire off of the hook?
A. Right.
Q. And then you continue walking over to the right side of the barge with the hook -- or excuse me, with the cable?
A. No, sir. I was pulling the cable down. He was -- Gerry had already started unspooling the winch.
Q. Okay. Where was the -- when you got to the center of the barge, where was the tug? Was it perpendicular to the barge, or was it already starting to tilt over to the starboard side?
A. It was coming around slowly.
Q. Okay. Did you have any problems walking from the left side of the barge to the center of the barge?
A. No, sir.
Q. Didn't have any problems seeing where you

Page 125

were going?
A. No, sir.
Q. Now, as you -- as you pick the cable off of the hook on the bow of the tug, Captain Meador is already operating the winch to let out more cable?
A. Correct.
Q. And as he's letting out the cable, you're continuing to walk with the cable over towards the timberheads?
A. No, sir. I was pulling the cable out. I was standing in front of the boat pulling some cable out --
Q. As it's --
A. -- off the drum.
Q. As it's being -- as the winch is turning around, you're gathering the cable?
A. Correct.
Q. All right. And was your plan, then, to wait until the winch had let out enough slack and the boat had gotten into position before you moved it over to the timberhead?
A. Yes, sir, that was my plan.
Q. Okay. So your -- at this point, you're standing in the center of the barge, and you're pulling on cable as it's coming off of the starboard

James Sawberger
2/28/2006

Cause No. 05-413
In Re Signet Maritime Corp.

Page 126

1  winch?
2      A.  Correct.
3      Q.  All right.  What happened next?
4      A.  That's when I slipped.
5      Q.  And what did you slip on?
6      A.  I don't know what it was.  I couldn't see
7  it.
8      Q.  Did -- which -- which foot slipped?
9      A.  My right foot first -- well, both of
10  them -- I was sliding.  Both feet was sliding.
11     Q.  When you say you were sliding, would you
12  have been sliding towards the starboard side of the
13  barge?
14     A.  I was sliding back toward the boat.
15     Q.  Okay.  You don't know what it was you were
16  sliding on?
17     A.  No, sir.
18     Q.  Was it -- you said it was after dark.  Was
19  it foggy that night?
20     A.  No, sir.  It was cloudy.  It wasn't foggy.
21     Q.  Was it damp?
22     A.  Dark night.
23     Q.  Was it damp at all?
24     A.  It felt a little damp, yes.
25     Q.  Could you tell whether or not you were

Page 127

1  slipping on water or moisture or something else?
2      A.  No, sir, rusty barge.
3      Q.  And in any event, you couldn't -- did you
4  look down to try to figure out what you were sliding
5  on?
6      A.  Yes, sir.
7      Q.  And what did you see?
8      A.  Nothing.  It was -- I couldn't see.  It
9  was -- I was in front of the boat.  The light -- the
10  boat was sitting up higher than the barge, and then
11  was pushing me out in front.  It was dark right
12  there at the front of the boat.
13     Q.  Because the push knee blocks the light from
14  the -- that's mounted to the center of the
15  wheelhouse?
16     A.  Correct.
17     Q.  So you were kind of in a shadow?
18     A.  Yes, sir.
19     Q.  Were you able to see -- from where you were
20  standing near the push knee, were you able to see
21  the timberheads on the starboard side?
22     A.  No, sir.
23     Q.  Okay.  How far did the shadow extend?  Did
24  it extend all the way over to the edge of the barge
25  or just part of the way over?

Page 128

1      A.  Say that again.
2      Q.  Yes, sir.  The push knee is going to be
3  here in front of the -- at the front of the tug,
4  correct?
5      A.  Correct.
6      Q.  All right.  And it doesn't go across the
7  entire width of the tug.  It's only just up here at
8  the very point of the bow?
9      A.  Right.
10     Q.  And so any shadow that it casts is only
11  going to be right directly across from it in this
12  area of the barge, right?
13     A.  Correct.
14     Q.  So there's not going to be any shadow of it
15  here on the far right side.  There's not going to be
16  any shadow over here on the far left side?
17     A.  Correct.
18     Q.  And so, tell me if I'm wrong, but the light
19  from the center floodlight is going to be extending
20  over into the right of the push knee and past the
21  left of the push knee; is that correct?
22     A.  Yes.  Now, he's coming around with the boat
23  at the same time.
24     Q.  Sure.  He's --
25     A.  To the starboard.

Page 129

1      Q.  He's moving from the port to the starboard?
2      A.  Correct.
3      Q.  Okay.  And so as he gets closer to the
4  starboard, there's going to be more light on the
5  starboard side?
6      A.  No light on the starboard side.
7      Q.  Because he's going to start -- because the
8  bow of the boat is going to start pointing towards
9  the port side?
10     A.  Port, correct.
11     Q.  All right.  Do you remember whether or not
12  there was anybody else aboard the tug that night?
13     A.  Tommy DeForest.
14     Q.  He was there as kind of a captain in
15  training?
16     A.  Yes.
17     Q.  And he was -- he was available if you
18  needed any help, true?
19     A.  I'd like to think so, yes.
20     Q.  Okay.  And you didn't ask Captain Meador
21  for any help that evening?
22     A.  He was in the wheelhouse.
23     Q.  Right.
24     A.  Both of them were.
25     Q.  Right.  But you didn't ask Captain Meador

33 (Pages 126 to 129)

James Sawberger
2/28/2006

Cause No. 05-413
In Re Signet Maritime Corp.

Page 262

1  enough water for you to slip in?
2      A.  No.  It was calm.
3      Q.  When Mr. Lowrance asked you what did you
4  slip in, I believe your initial answer today, this
5  morning, was, I don't know.  Do you remember that?
6          MR. BOEMER:  Objection, form.
7      A.  Yes.
8      Q.  (BY MR. ROGERS) When you said, I don't
9  know, did you mean, I don't know if it was water?
10  Or did you mean, I don't know if it -- what kind of
11  fluid it was?
12          MR. LOWRANCE:  Objection, form.
13          MR. BOEMER:  Objection, form.
14      A.  I didn't know what kind of fluid it was.
15          MR. ROGERS:  Excuse me --
16      Q.  (BY MR. ROGERS) Let me rephrase the
17  question.
18          MR. BOEMER:  Sheadyn, is one objection
19  good for all?
20          MR. ROGERS:  Yes, it is
21          MR. BOEMER:  Thank you
22      Q.  (BY MR. ROGERS) When you said, I don't know
23  what I slipped in earlier this morning, what did you
24  mean when you said that?
25      A.  Well, I couldn't see what it was, and there

Page 263

1  was some mud on the barge.  I had mud on my shoes.
2  I had fluids on it, on my shoes.
3      Q.  How is it that you know that it wasn't just
4  water, such as, let's say, dew, or rainwater or
5  ocean water?  How is it that you know that when you
6  slipped on February 4th to the 5th of 2005, how is
7  it that you know that it wasn't just water?
8          MR. LOWRANCE:  Objection, form.
9          MR. BOEMER:  Objection, form.
10      A.  Water don't smell like that.
11      Q.  (BY MR. ROGERS) And this fluid got on your
12  shoes?
13      A.  Yes.
14      Q.  Now you -- there was a lot of testimony
15  about you tracking it onto the Signet Liberty,
16  remember that?
17      A.  Yes, I did.
18      Q.  You said you got a towel and cleaned it up?
19      A.  Yes, I wiped it up, just run my -- with my
20  foot.
21      Q.  Now, the substance you were cleaning up
22  aboard the Signet Liberty, was that -- was that just
23  water?
24      A.  No.  The deck was painted gray on the boat.
25  I could see, like, a blue streak or something in it.

Page 264

1      Q.  Was this substance a slippery fluid?  Is
2  that how you would describe it?
3          MR. BOEMER:  Objection, form.
4      A.  Yes.
5      Q.  (BY MR. ROGERS) In your opinion, is this --
6  would you say that this is some type of substance in
7  the oil field industry?
8          MR. BOEMER:  Objection, form.
9      A.  Or it's coming out of the well, one.  I
10  don't know.
11      Q.  (BY MR. ROGERS) And you're sure it wasn't
12  water?
13      A.  It was not water.
14          MR. BOEMER:  Objection, form.
15      Q.  (BY MR. ROGERS) All right.  When you first
16  slipped after you grabbed the cable and you started
17  moving towards the starboard timber, could you smell
18  the gas-like substance at that location?
19      A.  Yes.
20      Q.  When you first slipped?
21      A.  Yes.
22      Q.  And did you feel anything in your back
23  after that first slip?
24      A.  Yes.
25      Q.  What did you feel?

Page 265

1      A.  Just like a knock.  I felt it again when I
2  was over at the starboard timberhead bent over,
3  sitting on it, pulling on the cable.
4      Q.  All right.
5          MR. LOWRANCE:  Objection,
6  nonresponsive.
7      Q.  (BY MR. ROGERS) Let me ask you, after you
8  felt that pain in your back or -- you felt a knot?
9      A.  Well, a knock.
10      Q.  A knock?
11      A.  Yeah.
12      Q.  I assume you then proceeded over to the --
13  the starboard timberhead?
14      A.  Yes.
15      Q.  And you mentioned an angle iron
16      A.  Yes.
17      Q.  Tell me what is it about the angle iron
18  that -- that -- I mean, did you use that to get over
19  there?
20      A.  Yes.
21      Q.  To the starboard timberhead?
22      A.  Yes.
23      Q.  Why did you need to do that?
24      A.  I wasn't going to take a chance and slip
25  again.  I was close to the edge of the water.

67 (Pages 262 to 265)